NOT DESIGNATED FOR PUBLICATION

No. 121,826

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

PABLO VILLA-JUAREZ,
*Appellant*.

MEMORANDUM OPINION

Appeal from Ford District Court; LAURA H. LEWIS, judge. Opinion filed May 21, 2021. Affirmed.

*Korey A. Kaul*, of Kansas Appellate Defender Office, for appellant.

*Natalie Chalmers*, assistant solicitor general, and *Derek Schmidt*, attorney general, for appellee.

Before BUSER, P.J., ATCHESON, J., and BURGESS, S.J.

BUSER, J.:  Pablo Villa-Juarez appeals his jury convictions for rape, aggravated criminal sodomy, criminal restraint, aggravated sexual battery, and aggravated intimidation of a victim. He presents two issues for our consideration. First, he contends the district court erred in dismissing his Sixth Amendment challenge to the venire. Second, he asserts the district court erred in allowing cumulative testimony which corroborated the victim's account of the charged crimes, improperly bolstering her credibility with proof of her prior consistent statements. Upon our review, we find no error and affirm the convictions.

1

S.M. provided the following testimony at trial regarding the sexual assault. S.M. had known Villa-Juarez for about three months, had seen him occasionally, but did not consider him a friend. Villa-Juarez called her in the evenings and texted her daily. One evening in April 2018, Villa-Juarez contacted S.M. The couple exchanged texts and later Villa-Juarez called S.M. and invited her to his residence. Villa-Juarez told S.M. that he needed to talk to a friend. S.M. told Villa-Juarez that she did not want to talk and was tired of his calls, but she agreed to meet with him so they could converse for the last time.

Villa-Juarez picked S.M. up and took her to his home. The couple went to his bedroom to watch a movie and talk. While in the bedroom, Villa-Juarez placed his pet mouse on S.M., and she asked him to remove it. He then started tickling her, and she asked him to stop that as well. S.M. told Villa-Juarez that she was just there to talk and was ready for their relationship to be over.

At this point, S.M. testified that Villa-Juarez pushed her down on the bed. Although S.M. told Villa-Juarez that she did not want to have sexual relations with him, he took off her pants and licked her vagina. S.M. tried pushing him back but was unsuccessful. Villa-Juarez then put his penis inside of her. S.M. pleaded with him to take her home. While Villa-Juarez was driving S.M. home, she told him that she was going to call the police. Villa-Juarez threatened to call his friends and have them do the same things to her that he just did if she called the police. When S.M. arrived home, she called the police.

Officer Madeline Kolbeck with the Dodge City Police Department responded to the call and interviewed S.M. Officer Kolbeck testified that S.M. reported that Villa-Juarez had been texting her and wanted to speak to her. She told Villa-Juarez that she did not want to speak with him because she had a boyfriend, but he begged her to talk to him

and said he was going through a rough time. S.M. said she agreed to meet, and Villa-Juarez picked her up and drove her to his residence. Once there, he started kissing and touching her, and she told him to stop and that she was only there to talk. Villa-Juarez said okay, but then pushed her back onto the bed and began touching her again. S.M. begged him to stop and asked him to take her home, but instead he had sex with her against her will. Officer Kolbeck described S.M. as distraught during this encounter, noting that her hands were shaking. Officer Kolbeck took S.M. to Western Plains hospital.

Amanda Guthrie, a forensic nurse at Western Plains, examined S.M. Guthrie noticed bruises on S.M.'s neck and legs. She did not note trauma in the genital area. Guthrie's report was admitted in evidence. It included a narrative account by S.M. about the incident. Guthrie also testified regarding what S.M. told her happened at Villa-Juarez' residence.

Sergeant Lee Kolbeck with the Dodge City Police Department interviewed S.M. as part of his investigation. The interview was video recorded and admitted into evidence at trial. Sergeant Kolbeck recounted S.M.'s version of events, which was consistent with her trial testimony.

Sergeant Kolbeck also interviewed Villa-Juarez. During the interview, Sergeant Kolbeck asked him whether he had sex with S.M. Villa-Juarez admitted that he did have sexual relations with her. When Sergeant Kolbeck asked Villa-Juarez whether S.M. wanted to have sexual relations, he responded that she did not. Villa-Juarez explained that he wanted to have sex because his girlfriend was pregnant and keeping him at a distance. He admitted to kissing S.M., putting his mouth on her vagina, and inserting his penis in her vagina. Villa-Juarez also admitted to Sergeant Kolbeck that he told S.M. that he would have a friend do the same thing to her that he did if she talked to the police, and

3

that he said this to scare S.M. Of note, Villa-Juarez specifically admitted to Sergeant Kolbeck that he raped S.M.

The State charged Villa-Juarez with rape, aggravated criminal sodomy, aggravated kidnapping, aggravated sexual battery, and aggravated intimidation of a witness or victim.

At trial, Villa-Juarez denied raping S.M. According to him, while at his home, he engaged in oral sex on S.M., and when he finished, she asked him to take off his clothes and lay down on the bed. Villa-Juarez testified that S.M. then got on top of him and put his penis in her vagina. He testified that it "wasn't a really good experience." He explained that S.M. accused him of hurting her and that she hurt him as well by moving against his penis in a way that caused him to lose his erection. According to Villa-Juarez, this was why he suggested calling a friend—so that someone could finish having sex with her after he lost his erection. Villa-Juarez confirmed that S.M. became angry at this suggestion, began cussing at him, and asked him to take her home, which he did.

The jury found Villa-Juarez guilty on all counts, except as to the aggravated kidnapping charge where the jury found him guilty of the lesser included offense of criminal restraint. The district court sentenced Villa-Juarez to 147 months in prison with a postrelease supervision term of 36 months.

Villa-Juarez appeals.

DENIAL OF MOTION TO DISMISS THE VENIRE

Villa-Juarez contends the district court erred in summarily denying his pretrial motion to dismiss the venire. He asserts that the district court should have at least held a hearing where the issue could have been further explored.

*The Pretrial Proceedings*

Eight days before trial, Villa-Juarez filed a motion to discharge the jury venire and for a hearing regarding venire selection based on Sixth Amendment grounds. In his motion, he alleged that Hispanics were systematically excluded from the jury venire in Ford County. In support of the motion, defense counsel explained that for many years he began tracking the composition of jury venires for cases in which he was the trial attorney. His personal data collection consisted of counting as Hispanic all potential jurors with names of Hispanic origin. Defense counsel reviewed potential jurors in 17 trials over a 10-year period. Included as exhibits to his motion were United State Census data from Ford County and juror information sheets with designations showing which potential jurors Villa-Juarez' counsel designated as Hispanic.

Defense counsel asserted that only 15.7% of the potential jurors in those 17 trials were Hispanic. He contrasted this with the percentage of Hispanics in Ford County, which he asserted was 51.2%. Defense counsel argued that the disparity was egregious. Such a large discrepancy, he claimed, demonstrated systematic exclusion of Hispanics from the jury selection process in Ford County in violation of Villa-Juarez' Sixth Amendment rights.

The district court heard oral arguments on Villa-Juarez' motion just before voir dire on the first day of trial. Finding insufficient evidence of systematic exclusion, the district court denied the motion.

"[S]election of a petit jury from a representative cross section of the community is an essential component of the Sixth Amendment right to a jury trial." *Taylor v. Louisiana*, 419 U.S. 522, 528, 95 S. Ct. 692, 42 L. Ed. 2d 690 (1975). "Restricting jury service to only special groups or excluding identifiable segments playing major roles in the community cannot be squared with the constitutional concept of a jury trial." 419 U.S.

5

at 530. The United States Supreme Court has set forth three factors that a person must show to establish a prima facie violation of the fair cross-section requirement:

> "(1) that the group alleged to be excluded is a 'distinctive' group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process." *Duren v. Missouri*, 439 U.S. 357, 364, 99 S. Ct. 664, 58 L. Ed. 2d 579 (1979).

The parties agree that the first *Duren* factor has been satisfied—Hispanics are a distinctive group in the community. See *United States v. Shinault*, 147 F.3d 1266 (10th Cir. 1998). The parties disagree, however, whether Villa-Juarez presented sufficient evidence to satisfy the other two elements of the *Duren* test.

In ruling on the motion, the district judge stated:

> "I have had an opportunity to review the 168-page motion that was filed with attachments. Based on my review of that, and the information that was provided therein, I am going to deny the motion and find that there is no proof of systematic exclusion by the Court on the issue that was raised."

The written journal entry of trial was also succinct, stating: "The Court finds insufficient evidence of systematic exclusion and denies the defendant's motion."

It is unclear whether the district court ruled in Villa-Juarez' favor on the first two *Duren* factors, whether it assumed the factors were satisfied for the sake of argument, or whether it considered the two factors at all. It is clear, however, that the district court considered and rejected Villa-Juarez' factual basis related to the third *Duren* factor—whether underrepresentation was due to systematic exclusion of Hispanics in the jury selection process.

6

Under the circumstances, for purposes of this appeal, we find that the first *Duren* factor was met, and we will assume—without deciding—that the second *Duren* factor was shown. Our review will be limited to a consideration of the third *Duren* factor: Assuming that Hispanics are under-represented in the jury venire, has Villa-Juarez shown that it is due to their systematic exclusion in the jury selection process?

*Standard of Review*

The parties each suggest a standard of review. Citing precedent from the Sixth Circuit Court of Appeals, Villa-Juarez asserts that this issue presents a mixed question of law and fact, which this court should review de novo. The State also proposes a de novo standard of review, noting that the court did not make any factual findings which leaves only a question of law.

The statute governing motions to discharge jury panels provides some guidance on the proper standard of review. It sets forth a procedure for courts to evaluate these motions. First, the court must consider whether the motion "state[s] facts which, if true, show that the jury panel was improperly selected or drawn." K.S.A. 22-3407(2). If the movant satisfies this step, then "it shall be the duty of the court to conduct a hearing." K.S.A. 22-3407(3).

In the present appeal, although the district court did not conduct an evidentiary hearing, it specifically considered a voluminous amount of evidence submitted by defense counsel before finding that Villa-Juarez failed to make a sufficient showing of systematic exclusion of Hispanics. Under these circumstances, our court is in just as good a position as the district court to evaluate the motion and supporting materials de novo to determine whether Villa-Juarez met his burden to show the systematic exclusion of Hispanics in the jury-selection process.

7

*Analysis*

On appeal, Villa-Juarez contends the district court erred when it dismissed his motion and found that he failed to provide sufficient evidence of systematic exclusion. Assuming for the sake of argument that Villa-Juarez showed that the representation of Hispanic people in jury venires is not fair and reasonable in relation to the number of such persons in Ford County, he was then required to prove that the "underrepresentation is due to systematic exclusion of the group in the jury-selection process." *Duren*, 439 U.S. at 364.

Villa-Juarez asserts that "proof of a statistical disparity, when shown to have occurred over a period of time, satisfies the third prong of [the] test." The State replies that Villa-Juarez must show more, specifically that the State actively discriminated in the jury selection process. The State asserts that "nothing in Villa-Juarez's motion to the district court or his brief for the Court of Appeals sheds any light on the cause of the underrepresentation of Hispanic jurors." We agree.

The process of selecting eligible jurors in Kansas is governed by state law and local rule. Under state law, jury lists shall be prepared from voter registration records, driver's license records, census records, and records of State identification cards. K.S.A. 43-162. The district court of each county prepares a list of potential jurors from these sources. K.S.A. 43-162; K.S.A. 43-157(b). Villa-Juarez' motion or brief does not inform us as to how Ford County compiles its juror list. We note that the Sixteenth Judicial District, which includes Ford County, states on its website that it primarily uses the list of licensed drivers provided by the State. A computer randomly selects a pool of potential jurors for each trial." https://16jd.kscourts.org/16th-Judicial-District/Jury-Duty. Our Supreme Court has held that jury panels selected from lists of registered driver's license holders is within the statutory mandates. *State v. Mayberry*, 248 Kan. 369, 381, 807 P.2d 86 (1991).

8

Villa-Juarez' argument on this element, in both his motion and appellate brief, is that the alleged disparity shown by his data is prima facie evidence that Hispanics are systematically excluded from the jury selection process. Importantly, he makes no argument—good or bad—about the procedures employed by the State to summon citizens of Ford County for jury duty.

Villa-Juarez' counsel has raised the same systematic exclusion argument before this court in *State v. Perez*, No. 119,336, 2019 WL 1746762, at *3 (Kan. App. 2019) (unpublished decision); *State v. Perez-Mares*, No. 119,632, 2019 WL 1746756, at *2 (Kan. App. 2019) (unpublished decision). We note Villa-Juarez' argument and evidence in support of the third *Duren* factor was similar in those cases to this case on appeal. In both prior cases, our court ruled that numerical evidence of disparity does not support an inference that the State caused the underrepresentation by systematic exclusion of Hispanics. There must be something more. *Perez*, 2019 WL 1746762, at *4-5; *Perez-Mares*, 2019 WL 1746756, at *3.

As noted by our court in the *Perez* and *Perez-Mares* decisions, the United States Supreme Court has had two lines of cases in which allegations of systematic exclusion have been successful. First, are "'rule of exclusion'" cases, where the movant shows that a cognizable group was totally excluded or only received token representation in the jury selection process. Second, are cases where a movant shows substantial underrepresentation and "'obvious opportunities for discrimination' [Citations omitted.]" *United States v. Test*, 550 F.2d 577, 586 (10th Cir. 1976) (discussing the two lines of cases).

Villa-Juarez' claim, like the claims in *Perez* and *Perez-Mares*, falls into the second category. Assuming he showed substantial underrepresentation of Hispanics in Ford County jury pools, he did not make any showing of opportunities for discrimination in

9

the process of selecting the jury venire. As a result, his argument on the third *Duren* factor is legally insufficient.

On appeal, Villa-Juarez cites *Duren* in support of his argument that numbers alone can satisfy the systematic exclusion requirement, quoting the following passage:

"Finally, in order to establish a prima facie case, it was necessary for petitioner to show that the underrepresentation of women, generally and on his venire, was due to their systematic exclusion in the jury-selection process. Petitioner's proof met this requirement. His undisputed demonstration that a large discrepancy occurred not just occasionally but in every weekly venire for a period of nearly a year manifestly indicates that the cause of the underrepresentation was systematic—that is, inherent in the particular jury-selection process utilized." 439 U.S. at 366.

In *Duren*, Billy Duren moved to dismiss the jury panel. Duren contended that his right to trial by a jury chosen from a fair cross-section of his community was denied by provisions of a Missouri law that granted women an automatic exemption from jury service upon request. *Duren* showed that women were substantially unrepresented in jury pools in Jackson County, Missouri. 439 U.S. at 359-61. The United States Supreme Court found that the disproportionate exclusion of women "was quite obviously due to the *system* by which juries were selected." 439 U.S. at 367. In other words, *Duren* demonstrated that the underrepresentation was due to the operation of Missouri's law which exempted women from jury service. 439 U.S. at 367.

Here, Villa-Juarez makes no showing that any jury selection procedure employed by the State caused the alleged underrepresentation of Hispanics in Ford County. See also *Castaneda v. Partida*, 430 U.S. 482, 494, 97 S. Ct. 1272, 51 L. Ed. 2d 498 (1977) (applying a test similar to *Duren*'s in a race-based challenge to grand jury selection and stating that the systematic exclusion prong required evidence of a "*selection procedure* that is susceptible of abuse or is not racially neutral" [Emphasis added.]). Unlike *Duren*,

10

where women were substantially unrepresented in Jackson County, Missouri, jury venires—which the Supreme Court attributed to Missouri's law granting women an automatic exemption from jury service upon request—in Villa-Juarez' case, there is no showing or suggestion that a statute, procedure, or practice has resulted in systematic exclusion of Hispanics. For this reason, *Duren* does not support Villa-Juarez' claim.

Statistical presentation of disparity can establish the second *Duren* factor of a prima facie case that the fair cross-section requirement under the Sixth Amendment was not met. *Duren*, 439 U.S. at 364. But that evidence is not sufficient to establish the third *Duren* factor. To establish the third *Duren* factor, there must be evidence in addition to statistical disparity for courts to infer that the underrepresentation is due to systematic exclusion of a distinctive group. Villa-Juarez did not make this showing. Accordingly, the district court did not err in denying his pretrial motion to discharge the jury venire.

ADMISSIBILITY OF CORROBORATING TESTIMONY

Next, Villa-Juarez contends the district court erred by allowing cumulative testimony from the responding officer (Officer Kolbeck), forensic nurse (Guthrie), and lead detective (Sergeant Kolbeck), along with Guthrie's report containing S.M.'s narrative and the recording of S.M.'s interview with Sergeant Kolbeck. Villa-Juarez asserts that this evidence repeated S.M.'s version of events to the jury multiple times, which improperly bolstered S.M.'s credibility with proof of her prior consistent statements. Although Villa-Juarez candidly concedes that in *State v. Kackley*, 32 Kan. App. 2d 927, 935, 92 P.3d 1128 (2004), our court found that witness testimony repeating a rape victim's account is permissible in rape prosecutions, he argues that *Kackley* was wrongly decided and should be overturned.

For its part, the State presents a multifaceted response. First, it argues that Villa-Juarez' claim that the district court erred in allowing the State to present evidence that

11

bolstered S.M.'s credibility was not preserved for appeal in the district court. Second, the State cites *State v. Washington*, 226 Kan. 768, 602 P.2d 1377 (1979), and *Kackley* for the proposition that evidence by other witnesses corroborating a rape victim's account of a sexual assault is admissible evidence at trial. Finally, the State argues that even if the district court erred, given Villa-Juarez' pretrial confession, any error was harmless.

Whether the district court erred in declining to exclude the evidence at issue is reviewed for abuse of discretion. *State v. Reed*, 282 Kan. 272, 280, 144 P.3d 677 (2006).

At the outset, we question whether Villa-Juarez preserved this evidentiary issue for appeal. At trial, Villa-Juarez objected to testimony from Officer Kolbeck, Guthrie, and Sergeant Kolbeck, as well as to Guthrie's report and Sergeant Kolbeck's recorded interview with S.M. On each occasion at trial the stated basis for the objection was that the witness' testimony was "cumulative."

For the first time on appeal, however, Villa-Juarez argues that the witness' repetition of S.M.'s account of the sexual assault was objectionable because:

> "[t]he general rule is that prior consistent statements regarding the details of a sexual assault are *not* a proper subject of testimony by a witness to whom a victim complained, and the only exception is that the person to whom the victim complained, if the complaint was made seasonably, may testify that the complaint was made and the circumstances surrounding it. To the extent the *Kackley* Court declared otherwise, it erred, and should be overruled."

Leslie Kackley was convicted of aggravated indecent liberties with a child under the age of 14. At trial, the victim, the victim's mother, and the investigating officer all testified regarding the victim's account of the incident. On appeal, our court noted that Kansas courts have "embraced the general rule that prior statements of a witness, consistent with his or her own testimony at the trial, are not admissible in corroboration

12

of the witness' testimony unless the witness has been impeached and then only for the purpose of rehabilitation." 32 Kan. App. 2d at 935.

However, our court stated that there was an exception to this rule for rape prosecutions, "where evidence of the complaint of the prosecutrix is permitted for the express purpose of corroborating her testimony through the testimony of other witnesses." 32 Kan. App. 2d at 935 (citing 65 Am. Jur. 2d, Rape § 61, p. 600-01). We asserted that Kansas courts embraced this exception in *Washington*, 226 Kan. at 770. *Kackley*, 32 Kan. App. 2d at 935. Our court extended the exception to prosecutions for sexual abuse of children and found that the district court did not err in admitting the corroborating testimony. 32 Kan. App. 2d at 935.

Returning to this case, on appeal Villa-Juarez glosses over the fact that he made a different objection at trial than the one he now argues. At trial, Villa-Juarez objected to the repetitious witness testimony as cumulative. But in *Kackley*, the defendant's objection was more specific than simply a general objection to cumulative testimony. There, the defense objection was based on Kansas caselaw generally holding that prior consistent statements of a witness are not admissible to corroborate the witness' testimony unless that testimony has been impeached. 32 Kan. App. 2d at 935.

Our Supreme Court has clearly addressed this situation wherein a defendant objects to admission of evidence on one basis at trial and then asserts a new basis to object on appeal: We have adopted a bright-line interpretation of K.S.A. 60-404. See *State v. Garcia-Garcia*, 309 Kan. 801, 810, 441 P.3d 52 (2019) ("Under K.S.A. 60-404, '"evidentiary errors shall not be reviewed on appeal unless a party has lodged a timely and specific objection to the alleged error at trial."'"). Moreover, it is not sufficient for a defendant to object on one ground and argue another ground on appeal. 309 Kan. at 810 ("The contemporaneous objection rule is not satisfied by objecting on one ground at trial and arguing another ground on appeal because it would undercut the statute's purpose.");

13

*State v. Richmond*, 289 Kan. 419, 429, 212 P.3d 165 (2009)("[T]he trial court must be provided the *specific objection* so it may consider as fully as possible whether the evidence should be admitted and therefore reduce the chances of reversible error." [Emphasis added.]); see *State v. George*, 311 Kan. 693, 701, 463 P.3d 469 (2020).

Villa-Juarez objected at trial to witness testimony reprising S.M.'s account of her sexual assault because the evidence was cumulative. For the first time on appeal, he objects because the testimony improperly bolstered S.M.'s credibility with proof of prior consistent statements. Because Villa-Juarez' complaint is at variance with Kansas statutory and caselaw procedural precedent, we find this issue is not preserved for appellate review. See 311 Kan. at 704.

Finally, for the sake of completeness, we observe that if we were to consider the merits of Villa-Juarez evidentiary issue and assume that admission of some or all of the challenged evidence was erroneous, we would conclude that such error was obviously harmless.

As summarized in the Factual and Procedural Background section of this opinion, there was overwhelming evidence of Villa-Juarez' guilt in the sexual assault of S.M. At trial, S.M.'s testimony established the elements of the crimes charged. As S.M. told Villa-Juarez, she promptly reported the crimes to the police. The first officer to interview S.M., Officer Kolbeck, described her as distraught and teary, with her body and hands visibly shaking. Shortly thereafter, Guthrie examined S.M. and noted bruises on her neck and legs. Most importantly, during Sergeant Kolbeck's interview of Villa-Juarez, the defendant candidly admitted to raping S.M. and described the sexual assault with details that closely corroborated S.M.'s testimony at trial. Applying the federal constitutional harmless error standard, we are convinced beyond a reasonable doubt that there is no reasonable possibility that any claimed evidentiary errors affected the verdicts. See *State v. Williams*, 306 Kan. 175, 203, 392 P.3d 1267 (2017).

Affirmed.